*P. J. Cadwalader* and *Ben B. Dale,* for plaintiffs in error.

*Charles J. Hunt,* contra.

---

## LIABILITY FOR DEATH OF A FREIGHT CONDUCTOR WHO FELL FROM HIS TRAIN.

[Circuit Court of Huron County.]

MARY CRAWFORD v. NEW YORK, CHICAGO & ST. LOUIS RAILROAD CO.

Decided, 1901.

*Railways—Negligence—Voluntary Assumption of Risk by Conductor— In Leaving His Caboose to Observe Signal Lights—And in Using Defectively Equipped Caboose—Delay in Changing Lights—Sudden Jerk of Train—Ballast Along Side of the Track—Jury Must Not Guess at Cause of Accident.*

A freight conductor, who had used for more than a year without complaint a caboose defectively equipped for safety, stepped from the caboose, contrary to the rules of the company, upon the car next ahead, which was a gondola, for the purpose of observing whether the light at the station the train was approaching showed red or white, and in attempting to return to the caboose fell between the cars and was run over and killed. *Held:*

1. That he had assumed the risk of an improperly equipped caboose, and also the risk of going onto the gondola car.

2. That the uncertainty whether he fell between the cars by reason of a misstep, or a jerk of the train, would not permit of a guess by the jury that his fall was due to a jerk of the train; and moreover a jerk of the train was liable to occur, and he should have been on his guard expecting it to occur.

3. That the presence of ballast piled a foot or less high alongside of the track was not an impediment to his escaping from between the wheels, which were upon him in an instant rendering escape impossible under any circumstances.

HULL, J.; HAYNES, J., and MOONEY, J. (sitting in place of PARKER, J.), concur.

Plaintiff in error in this action was plaintiff below and judgment having been rendered against her in the court of common pleas, this proceeding in error is prosecuted to reverse that judgment.

She brought her action as administratrix of the estate of John M. Crawford, deceased, under the statute to recover for the death of Crawford, who was the husband of the plaintiff, and whose death, it is claimed, was caused by the negligence of the railroad company.

The accident in which Crawford lost his life occurred in May, 1898. He was for a long time prior to the accident employed by the railroad company, and at the time of his death was a freight conductor and had been for some time prior to his death. He was the conductor of the train in question, and operated the caboose from which he fell for about a year prior to his death.

On the night of the accident he left Bellevue with his train about 11 o'clock or a little after, proceeding eastward. When they were near the station at Kimball, which is a few miles east of Bellevue, Crawford was in the caboose, the train slackened its speed as they approached the station of Kimball, which is also a crossing of the Nickel Plate (the name by which defendant is called) with the Baltimore & Ohio Railroad. The signal light at the station, as they approached, was red, which indicated, as long as it continued red, that the train was to stop at that station for orders, and pursuant to this signal, as the train approached the station, the engineer put on the brakes and slackened the speed of the train.

Without, at this time, going into the details of the accident, I will say that Crawford was sitting in the caboose as they approached the station, and before they reached the station or crossing he stepped out of the caboose onto, or across onto, a gondola freight car which was just ahead of the caboose, and while there he attempted to look out to see how the light was. There was a brakeman there also by the name of Mahoney, and

while at this place and in this position the light was changed
from red to white, the white light meaning that the train might
proceed.   Crawford then started back to the caboose, and as he
was going back in some way he fell off the train and was run
over, probably by the four wheels on the south side of the ca-
boose, and when the train stopped, it backed up a little so that
the hind wheel of the hind truck ran over him again and he
was instantly killed, or died within a few minutes after his body
was taken from this position, between the wheels.

There are various acts of negligence alleged and complained
of against the railroad company, which it was claimed by the
plaintiff was the cause of the death of Crawford.

The case was tried in the court of common pleas to a
jury, and at the conclusion of the testimony for the plaintiff,
upon the motion of the defendant, the jury was instructed to
return a verdict in favor of the defendant, which was accord-
ingly done and judgment entered thereon.   It is this judgment
that is sought to be reversed in this proceeding in error.

The amended petition, after setting forth in detail the griev-
ances of which the plaintiff complains, contains a brief summary
of the alleged negligence of the defendant, which is as follows:

"The plaintiff says that said Crawford was without fault or
negligence upon his part and that the injury was caused by
and on account of the negligent acts of the defendant in the
following particulars, to-wit:

"First.   In indicating at said station of Kimball by said red
light that there were orders there for said train, when in fact
there were no orders at said station for said train.

"Second.   In leaving said gravel along the side of said track
for the length of time described in this petition.

"Third.   In starting said train suddenly and without warn-
ing after having given a signal to stop said train for the pur-
pose of receiving said orders.

"Fourth.   In said operator giving to said engineer the signal
to proceed without requiring him to come to a full stop, and
giving him the said clearance card in accordance with the rule
described in this petition.

"Fifth.   In not providing and enforcing a rule requiring
said engineer to give a signal by whistle or otherwise that he
was about to increase the speed of said train, suddenly after hav-

ing given a signal to stop for the purpose of receiving said orders.

"Sixth. In using upon said railway the caboose that was defective, in not having at each end a sufficient platform and a hand-rail for use upon occasion similar to the one described in this petition.

"Seventh. In not providing a step at the end of such caboose upon which the said J. M. Crawford could stand when about to alight from said caboose for the purpose of receiving said orders; and

"Eight. Not providing at the end of said caboose a guard or rail to which the said J. M. Crawford could cling when about to alight from said caboose for the purpose of receiving said orders."

The error complained, which practically covers the whole case, is the action of the court in taking the case away from the jury.

The question is whether, as the evidence stood at the conclusion of plaintiff's testimony, there was any evidence which ought, under the rules of law, to have been submitted to the jury. If there was no evidence to show negligence an the part of the railroad company, or, if there was evidence which showed, as a matter of law, that the plaintiff's decedent himself was guilty of contributory negligence, then as a matter of law the court properly instructed the jury to return a verdict in favor of the defendant.

It will be well to consider first just what the situation was at the time of the accident. As I have said, Crawford left Bellevue with his train about 11 o'clock that night. As the train approached Kimball, the station in question, which is a few miles east of Bellevue, he was sitting in the caboose looking out of the window from the side of the car, and from that point could observe the light as they approached the station, and as the train approached the station the engineer gave a long whistle, a signal to stop, and slackened the speed of the train, the signal light at the station being red. The rules of the company provided that the light should be kept red at all times except when a signal was given to the train that there were no orders for it and that it might proceed; that is to say, the proper color for the light to be at all times was red, and if there was no reason

why the train should stop, if there were no orders for it, then the operator changed the color to white and the train might proceed.

Then, the light being red, as the train approached, the engineer slackened and the conductor could have seen that the light was red. He knew that unless the light was changed, the train would stop for orders which it would be his duty to get.

The brakeman, Mahoney, was sitting on the gondola car just ahead of the caboose. The door in the end of the caboose was open, and as Crawford sat in his car checking up his bills near the window, instead, apparently, of taking particular pains to look at the light himself, he called to Mahoney and asked him how the light was, and Mahoney told him it was red, and then, apparently wishing to see for himself, he came out at the end door and stepped across onto the gondola car. There was no platform on the end of the car. It was a box freight car that had been made over into a caboose, and there was nothing there except a narrow step over the draw-bar, probably about eighteen inches wide. He stepped onto that and crossed over to the gondola car and sat down on the edge of the gondola and looked around the corner or end of the car to look ahead for himself and see what the color of the light was, the brakeman having said to him before, as the record shows, "it is red now."

Mahoney testifies that Crawford came out of the caboose and looked out, and as he looked out, Mahoney testifies, "I says, all right, it is white." Then he started back into the caboose. The train from the time they first began to slacken speed, as they approached the station—during all that time, the train was continuing to slacken, and we think the record shows very clearly that the train did not stop until after Crawford fell off, although there may be a word here and there in Mahoney's testimony which might indicate that it did, but he evidently did not mean to say that, as shown by his whole testimony. The train was continuing to slacken all the time, and Mr. Crawford knew that if the light remained red, that the train would come to, and was required to come to a full stop, but if the light turned to white it would proceed without stopping for orders.

The evidence clearly shows that it was the custom for this train to proceed without stopping if the light changed from red to white. We are not able to say, upon examination of the rules, that would be a violation of the rules, if the light was changed from red to white, although the light had remained red until the train was nearly ready to stop.

Mahoney looked at the light after Crawford came out on the car and said, "All right, it is white." Crawford then knew that the train would go ahead. He knew that from the rules. He know that from custom, and his conduct shows that he knew it, for he at once started back into the caboose upon this information from Mahoney, and he saw or could have seen the light himself.

As Crawford started back into the caboose the engineer apparently was putting on the air and it caused the cars to run together. Mahoney heard the noise and Crawford, being there, must have heard the same thing that Mahoney did, and Mahoney called out to Crawford and said, "Look out, John." Just at that time, or just before that, John had started back toward the caboose. Mahoney says, "I says, 'look out, John,' and with those words I braced myself and the next thing I heard was the rattling of his lamp and he says the caboose fell back on the rail. As the caboose went onto the rail, I hollered and asked him if he was hurt and the next place he was out on the ground." He got off, and soon after he got off the train stopped and then started up again, and he signalled the train then to stop and they stopped and he found Crawford's body, as I have already stated, between two wheels, the south wheels of the rear truck. The four wheels had passed over him, then the train had backed a little and the last wheel passed over him again.

There are, as I have said, several grounds of negligence alleged, one of the grounds being that there was no rule of the company requiring the engineer to give a signal when he was about to stop or start his train upon an occasion of this kind, but there was a rule, however, forbidding his starting unless the conductor gave him a signal, but there was no rule requiring him to give a signal when about to stop his train suddenly, and it is argued by the plaintiff in error that the question should

have been left to the jury whether ordinary care required the railroad company to have such a rule. The evidence shows the engineer was trying to stop the train when Crawford fell off, and it is claimed that the danger to trainmen in such stopping of the train is such that ordinary care requires that there be a rule requiring the engineer to give a signal, or at any rate that it was a proper question to leave to the jury.

There was a rule of the company which required the conductor of a freight train, while his train was in motion, to be in his caboose or on the top of the caboose. Rule No. 243 says that the proper place for the freight conductor while his train is in motion is in the cupola of his train, if it have one, so that he may have a full view of his train and enable him to see that his men perform their duty and know that his brakemen come out promptly when necessary, and he must keep a sharp lookout, etc.

Passing at this time to the other question, as to whether there should have been a rule requiring a signal to be given, and whether the fact that there was not such a rule contributed to Crawford's injury. As has been suggested, when this train neared the station, perhaps forty or fifty cars away, Crawford knew or by looking out of the window at the side of the car might have known that the light was red, and that that meant, if it continued red, that his train was to stop; but not caring to rely entirely upon his own observation, for some reason he asked Mahoney, and Mahoney told him that the light was red and he knew that the train, if the light continued red, would stop. Then, to make observation for himself, or so that he might be where he could get off easily, if the light turned to white, he came out and stepped over onto the gondola car, the light still being red and the train during all of this time slacking in speed and the engineer all this time evidently putting on the brakes for the purpose of stopping the train and finally putting them on with such force that the cars were bumped together, as Mahoney testifies, and finally Crawford is notified by Mahoney calling out to him to ''look out,'' the train was about to stop, that there might be danger. Crawford at that time being about to step from the gondola car to the caboose.

With all of these circumstances, with this notice to Crawford that the train was about to stop, with his knowledge of the rules that it was required to stop if the light was red, with his experience as a railroad man, as an old railroad man, knowing that the train was in the very act of stopping, it seems to us that a signal from the locomotive would not have given Crawford any further notice than he then had of the fact that the train was about to stop. There was every sign, every notice, every indication that could be given, that the train was stopping pursuant to the order that was given by the red light, and the whistling or the ringing of the bell from the locomotive could have given him no additional information—could have made no difference with his conduct upon that occasion. It is claimed by counsel for plaintiff in error that ordinary care might require the giving of such signal; and it is claimed the question should have been submitted to the jury as to whether ordinary care on the part of the railroad company required a rule compelling such signal. But if the absence of such a signal did not contribute in any way to the injury and death of Crawford, it was not, as the term is sometimes used, "legal negligence" so far as this case is concerned, that is, negligence directly causing the injury and death complained of. And we find the absence of the signal here or the absence of the rule did not contribute in any way to the injury and death of Crawford.

If, on the other hand, the train had actually stopped on account of the red signal being given, Crawford had notice that the light had been changed from red to white, and he knew that the train would proceed immediately upon its journey and would start at once after the light was changed from red to white. The evidence shows clearly that that was the custom upon this train, although it might be argued that this was a technical violation of the rule. Still, upon an examination of that rule it is not clear that it would be—the rule is No. 522, page 98 of the book of rules:

"A fixed signal must be used at each train order office which shall display red at all times where there is an operator on duty, except when changed to white, to allow a train to pass after getting orders, or for which there are no orders. When

red is displayed all trains must come to a full stop and not proceed as long as red is displayed, unless furnished with a clearance card on specified form, stating over the operator's signature that he has no orders for that train.''

It is urged that there should have been a clearance card given. But the rule provides that trains shall not proceed so long as red is displayed unless furnished with a clearance card on a specified form. But red was no longer displayed when the light was changed from red to white. The rule proceeds:

''The signal must be returned to red as soon as a train has passed. It must only be fastened at red when no operator is on duty.''

But aside from any close construction of this rule, it appears from the testimony that it was the custom of this train, when the light was changed, for the train at once to proceed. It was their custom, as the uncontradicted testimony shows, to watch for this light, as the train approached, and if it was red, to watch to see whether it would change to white. The light on the night in question did not change to white until the locomotive was about opposite the signal station, opposite the light, or perhaps a little past the light. So that in either event, as we view it, whether the train was nearly stopped, or about to stop apparently, or whether it had actually stopped and started again, Crawford, with his knowledge of this rule and of the custom, was fully notified of exactly what he might expect the train to do, and that the absence of the signal did not contribute in any degree to his injury.

It is urged also that there was negligence in the operator in displaying the red light as long as he did and not changing it to white; that he should have changed the light sooner, and that holding it red so long, indicated there were orders while there were none.

If this were true, it does not seem to us that that was the proximate cause of Crawford's injury. Holding the light red did not cause this injury, nor was it caused by changing it to white. Crawford may have taken a position upon the outside of the car which he would not otherwise have taken if the light

had turned to white sooner than it did. But we are unable to see that what was done with this light could be regarded as the proximate cause of his injury. As to his going out on the car, his proper place, under the rules, was in the caboose; still, under all the circumstances, it is not necessary to hold that he was guilty of contributory negligence in going outside of the car. Perhaps it would be the natural thing for him to do. Perhaps it was customary, but still if he went outside of the car, under those circumstances, or to the end of the car where there was no platform, on to a freight car, where the rules of the company did not require him to go, and where he was forbidden to go, it would seem as though he took his own chances as to an accident of this kind happening to him.

It appears from some of the testimony—an answer or two that we find in the record, that it may have been the custom to go ahead over the train and get off somewhere near the middle of the train. Probably it was the custom to go ahead and get off and get orders without compelling the train to come to a full stop. There was no rule requiring this, but a strict reading of the rule would require the conductor to be in the caboose.

As to the caboose itself, it is urged that it was defectively constructed and it must be said that a box freight car remodeled as this one was can hardly be commended as a caboose for men to use in the performance of their duty upon the road. Still it was a car that was in general use upon the road. Crawford had used this very car for over a year and he was fully acquainted with the car and the defects complained of, if any, and that there was no platform at the end of the car; there were no handholds to take hold of and nothing to save a man, or prevent him from falling off, and it is true that there was nothing there but this narrow step to which I have referred; it evidently was not the purpose or intention that the conductor and brakemen should stand there.

There was, however, at the side of the car, a door; a door and two windows on each side, and the door was provided with a step and with a hand-hold, as shown by one of the pictures attached to the bill of exceptions. The testimony shows that it was the intention that the men should get on and off at the

side and not at the end, where it had no platform of any kind, or guard, and only this step about eight inches wide and perhaps eighteen inches long crosswise of the car. But having used this car for this long period of time without complaint and having full knowledge of the defects in the car, it seems to us that under the well established rules of law he assumed whatever risk there was in continuing to occupy and use this car. It was something of which he had full knowledge and had had for more than a year.

But it does not appear—it is not established by the evidence—that Crawford was thrown off the car by the reason of any jar. He fell off about that time, and he may have been thrown off by the jar, or he may have missed his footing as he stepped from one car to the other and may have fallen off. All that Mahoney knows is that shortly after he said "look out, and heard the rattling of his lantern," Crawford had fallen off the car. He may have been thrown off by the jar, it is true, but that he *was* thrown off by the jar is hardly established by the evidence.

The Supreme Court has said in a recent case that where an injury may have been caused by one of the two things, if one of them might have happened through one of the causes without any negligence on the part of the defendant, the jury would not be permitted to guess that it happened on account of the other.

It was urged further that there was negligence in leaving gravel alongside the track for some two or three weeks before the accident, and that this contributed to the injury, and that if it had not been for the gravel, Crawford might not have been killed. Gravel had been thrown off from the cars in the ordinary course of business for the use of the railroad company and left for a distance of forty or fifty car lengths alongside the track, at the height of not more than a foot, and in some places lower. Where Crawford was killed, according to the testimony, it was four, five or six inches in depth. Gravel had been thrown off for ballast for the road. This track was not in the yards of the company; it was a railroad crossing simply, and we are of the opinion that it was not negligence on the part of the railroad company to leave this amount of gravel which had been put

there for use, for two or three weeks, alongside the railroad track. It could not have been anticipated that a man would fall off at this point and fall onto the track between the rails in that way, and that this gravel would or might interfere with his getting out from under the wheels, nor does it appear to us that the gravel did in fact interfere or prevent Crawford from escaping injury.

When he was found his head was resting outside the rail upon the gravel some five or six inches in height, while his legs and the lower part of his body were between the rails, and the car passed across the middle of his body, crushing him. His arms were thrown in such a way as perhaps might indicate that he had tried to ward off the wheels and to pull himself out from under them. But lying or falling in this position, with the train in motion, the greater part of his body between the rails, his head projecting for some distance over upon the gravel, we are unable to see how this amount of gravel at that point contributed in any way to his injury or prevented him from escaping.

The injury happened in an instant of time. He fell immediately in front of the wheels of this caboose and they were on him in an instant, in the fraction of a second.

After a full review of the record in this case, unfortunate as this accident was and terrible a calamity as it was, we are unable to see that there was any evidence tending to show negligence on the part of the railroad company at the time of the accident that contributed to Crawford's injury or any negligence, or any risk in regard to the construction of the car that he did not himself waive and assume.

We find then that the court did right, under the rules of law, in directing a verdict in favor of the defendant.

We have examined the exceptions that were taken during the trial of the case, and while some of the testimony to which objection was sustained might have been admitted, we think, as to the custom of stopping at this point without putting in evidence the written rule, still, in the end, that testimony substantially was admitted and the rules themselves were put in evidence so that the plaintiff had the opportunity to present his case fully,

and no claim is made here that the plaintiff was prevented by the court from presenting the evidence and all the facts that he cared to present in order to make out his case.

We find no error prejudicial to the plaintiff in any ruling of the court upon the trial, and the judgment of the court of common pleas will be affirmed.

*Jesse Vickery* and *Horace Andrews,* for plaintiff in error.

*C. P. & L. W. Wickham,* for defendant in error.