## COY v HOWARD CONSTRUCTION CO et

Ohio Appeals, 2nd Dist, Greene Co

No 363.   Decided March 29, 1932

Marshall & Marshall, Xenia, for plaintiff.

Marcus Shoup, Xenia, and Mills & Fowler, Dayton, for defendant, The Howard Construction Co.

Kelly & Knee, Dayton, Amicus Curiae.

## BY THE COURT

The five particulars in which it is claimed that the defendant Contractor failed to observe the plans and specifications for said school building are:

1. In using pit run gravel instead of clean washed gravel.
2. Failure to paint the structural steel.
3. Has used and is using in the construction of said building, Haydite or cinder block in bearing walls, instead of a good quality of common brick.
4. Has failed to use cement mortar and in its stead has used a patent mortar.
5. Has failed to properly anchor the bar joists which support, to a great extent, the second floor construction.

The first, second and third claims need not be given any considerable attention as it appears that substantial observance of the provision as to painting the structural steel may yet be made and the use of some pit run gravel and patent mortar has not resulted in any fault of construction which would not have occurred with the gravel and mortar specified.

Before considering the third and fifth claims above set forth, we give attention to some phases of the law of the case.

The facts out of which this law suit grows are unusual. The action is instituted by a taxpayer. The Board of Education is not a party plaintiff, but is a party defendant. The Board, as such, has not and is not now objecting to the construction of the building as progressing. The architects make no claim that the plans and specifications have not been fully observed to their satisfaction and the Contractor insists that he has followed them.

There is no claim in the petition of illegality of contract, of collusion between the Board, the Architects and the Contractor and no direct charge of fraud against any of them.

In this situation, it is contended by counsel for the Contractor that this action cannot be maintained; that the right to represent the citizens of Beaver Creek Township Rural School District in all matters incident to the building of the school structure under consideration is by law (§§7620 and 7690 GC) vested in the Board; that objection to the contract of construction and the building operations carried on in pur-

suance thereof cannot be asserted by another in the absence of illegality of contract, fraud or collusion or abuse of discretion by the Board in inducing or in the execution of the contract; and further that before a taxpayer's suit would lie, if a cause of action existed in favor of the Board, it must be preceded by refusal of the proper local authority to begin the suit after request duly made upon it so to do.

In support of the first proposition we are referred to Weir v Day, 35 Oh St 143, Walker v The Village of Dillonvale, 82 Oh St 137, Youmans v Board of Education of Education of Washington Township, v Board of County Commissioners, 13 O.C.C. 207, Merrimon v Paving Co., 142 N. C. 459, 24 O. Dec. 495. All of these cases grant or refuse the relief sought upon the proof or failure of proof of an illegal act of the Board of Education and thus, it is claimed they are authority inferentially at least, that no other ground will support such actions.

On the second proposition there is cited Merrimon v Paving Co., supra.

The case of Davis v White, (Neb. 234, SW 764) holds that taxpayers, whose right to sue to protect the interests of the district, arises out of the failure or refusal of the officers to do so, have no greater right to sue to protect such interests than the designated officials have.

The principle supporting the authorities is well established. We find no case, and our attention is directed to none, paralleling the instant suit.

On the question of the necessity that the taxpayer notify the Board to institute the action before beginning his suit, it appears that it would have been a vain thing for him to have taken such action, because the Board at the inception of the suit and throughout the trial of the case has not taken a position adverse to the defendant contractor.

We hold that, inasmuch as the amended petition charges that the Contractor is erecting a building in violation of the specifications and so that it is dangerous and unsafe, we may intervene to prevent a continuance of this construction when, and if, it appears, that the building as being erected is unsafe. At the outset it should be said that, in this action, we are not concerned with the compliance or non compliance of the Contractor with the provisions of its contract, the requirements of the specifications and plans for the erection of the school building, as such, unless upon showing of non compliance by the Contractor it appears that it is erecting and the

Board permitting the erection of an unsafe or dangerous structure. If this appears, the suit should be maintained, as the result would be irreparable injury, a ground always recognized as authorizing equitable intervention. (**Helmers et v McCarthy et, 6 Oh Ap 423**). It would seem that it would not be seriously urged that it would be lawful or within discretionary power for a contractor and architects, representing the School Board, no matter how innocent their motive, to disregard the express provisions of the plans and specifications for a school building under erection and thereby cause and permit the building to become unsafe.

This case was tried upon the amended petition and answer and no motion to make definite or certain was filed to the amended petition. This gives considerable latitude in determining and defining the issues.

Coming then to the claims of plaintiff upon which a great bulk of the testimony was taken, numbered three and five, viz: that the Contractor violated the provisions of the specifications and that (3) he used cinder block in bearing walls when he should have used "a good sound quality of common brick"; and (5) he failed to properly anchor the bar joists, which support, to a great extent, the second floor construction, all of which construction is unsafe and dangerous."

The following are all the paragraphs from the specifications relating to the material to be employed in backing up the face brick walls of the building.

"GENERAL BUILDING CONSTRUCTION.

The general building construction consists of reinforced concrete and structural steel frame work, brick bearing walls, reinforced concrete and steel joist floor slabs, cinder block, or haydite non bearing partition walls.

"BRICK WORK.

Brick work includes the furnishing of all materials, labor, tools, equipment, scaffold, etc., as required to complete all common hollow and face brick work, fire brick, stack lining and any other items required to make this branch of the work complete.

Note that in general exterior and interior brick walls are bearing walls for floor construction.

"BACK UP BRICK.

For backing up all face brick walls in all places where concrete slabs and beams are not bearing use 5x8x12 Haydite or cinder blocks. For all window piers and walls that are load bearing a good sound quality of common brick is required. The six inch

non bearing partitions are to be 4x5x12 inch Haydite or cinder blocks.

"NOTICE TO GENERAL CONTRACTORS.

No changes in plans and specifications or no extras for additional work shall be allotted unless a written order has been granted by the Architect."

It will be noted that the provision for "General Building Construction" recognizes a difference and differentiates between "brick **bearing** walls" and "cinder block or Haydite **non bearing partition walls**" and associates brick with **"bearing walls"** and cinder block with walls which are non bearing, and the following provision headed, "Brick Work" designates what the brick work shall consist of as "common hollow and face brick work." Although there is no comma between common hollow brick, it probably meant common and hollow and face brick. By a note appended to this heading, the fact that brick walls are bearing walls (note the plural form) is stated thus, "Note that in general exterior and interior brick walls are bearing walls for floor construction." Having defined bearing walls, above, as brick walls and non bearing partition walls as cinder block or Haydite walls, the further language under the heading "Back Up Brick" is not difficult of interpretation. "For backing up all face brick walls in all places where concrete slabs and beams are not bearing use 5x8x12 Heydite or cinder blocks."

Then follows, "For all window piers and walls that are **load bearing** a good sound quality of common brick is required."

A wall which bears a joist upon which the concrete floor, the super floor and the roof rest would, in our judgment, be a load bearing wall. The steel joists are carrying directly the load of the floor above and the ends of the joists are resting upon a bearing not greater than 4x4½ inches. Then, too, the specifications further show that the walls upon which the end of the joists and the concrete floor rest are bearing both "beams" and "concrete slabs." Under the heading, SECOND FLOOR SLABS, we read:

"In general second floor **slabs** are of steel joist with metal lath and **2 inch concrete.** Joist shall be junior **I beams** or bar joist **as shown on drawings."**

The bar joist being used instead of I beams would take on the characterization of beams as they are so used and carry the same load. The slabs are defined and

will be carried by the steel bar joist.

The last sentence under the heading "Back Up Brick" provides that, "The six inch non bearing partitions are to be 4x5x 12 Haydite or cinder blocks." This last sentence designates the type of partition walls in which the smaller cinder block may be used. The partition walls between the class rooms are clearly included within this description. They are six inches thick and run with the joists. We are convinced by the language of the specifications that a good sound quality of common brick and not cinder block or tile are to be used in all load bearing walls, as we have characterized them, and to the extent that this requirement was not observed, the specifications were not followed.

The testimony supporting this conclusion is, in our opinoin, more reasonable than that which was offered to support the theory that there is but one load bearing wall in the building; that the term "load bearing" means "concentrated load bearing" and finally that cement block and Haydite may be under the specifications classified as common brick.

It is claimed that the Board acquiesced in the interpretation of the specifications as permitting cinder block when they discussed it with the architect Walker and heard him so inform certain prospective bidders.

But this change in specifications was not made upon any written order by the architect and the Board acted as individuals and not as a Board. (See **Ohio ex Steinbeck et v Treasurer, 22 Oh St 144**).

Mr. Buettner, who prepared a bid on the brick work, states that he made no inquiry as to substitutions for brick, as the specifications were perfectly clear. This is in accord with our opinion.

It is urged that the Contractor in figuring his bid, estimated the cost of cinder block and load bearing tile only and that any saving resulting therefrom was passed on to the Board. This position is not tenable, because it cannot be said that some other contractor may not have underbid the defendant Contractor had he also made his estimates without figuring the cost of common brick. A hasty examination of the list of the bidders and the respective quotations on various types of work to be done in the structure discloses that the defendant Contractor was the highest bidder on brick, namely, the sum of $40,000.

The next question is whether or not the plans and specifications respecting the anchoring of steel joists to the walls have been met. There are pages of testimony on the subject of whether or not the steel joists covering the 23 ft. span were long enough and had the bearing on the walls which the plans required. The amended petition only challenges directly the method of anchoring the joists to the walls and no complaint is made respecting the length of the joists nor the extent of their bearing on the walls. Of course, the testimony respecting the length of the steel joists and the extent of the bearing on the walls was competent but we seriously doubt if we have any right, under the state of the pleadings, to make any decree affecting the insufficiency of the joists or their bearings as they relate to the joists, although we will discuss these questions and will consider the effect of the bearings on the safety of the wall.

The specifications are silent on the type of anchors to be used in tying the steel joists to the walls. There is a general provision in the specifications (page 12) as follows:

"All joists shall be anchored to walls as directed, leveled up and bridged."

The plans, however, show what the draftsman says is a Truscon steel joist and the plate of this joist taken from the catalog, which showed two holes in it, and there also appears on the plans an anchor bolt extending through the hole in the plate and into the wall for some distance. Neither the bearing plate nor the anchor bolt is dimensioned, although a scaling of them, upon the basis of a 13 inch wall, indicates that the bearing plate is six inches over the wall and that the anchor bolt is ten inches long. The architect says that as the trade designation, SJ 126, SJ 125 or SJ 84, as the case may be, appeared on the plans and the span was dimensioned, that this definitely indicated both the type and the length of steel bar joist required. Most of the witnesses agree that the plans are indefinite. We believe they are as to the bearings, although in all probability the architect could have required the contractor to have used steel joists with six inch bearing on the walls. There is no uncertainty as to the type of anchor displayed on the plans. Mr. Macomber, who is president of the company which made the joists used on the job, says that they are of the proper length. In this he is supported by several other witnesses. It appears that the steel joists are made in standard lengths varying in

length by one foot. Mr. Macomber, Mr. Burton and other witnesses say that a four inch bearing of a Macomber joist on the walls is safe construction and good practice. We would be constrained to so hold if there is the full four inch bearing thereunder. Mr. Macomber and Mr. Burton for the defendant, and Mr. Bell for the plaintiff, testify that the anchor used to tie the steel joists to the walls having been made and laid under the direction of the architect, meets the requirements of the specifications. With this, we do not agree. We are frank to say that we are not impressed with the arrangement made to anchor these joists to the walls, but we would not be disposed to set our judgment up against Mr. Macomber, the man who made and sold the joists, and Mr. Burton and Mr. Bell, all of whom say the anchorage is proper and safe.

We are impressed with the testimony of Frank Burton. His qualifications and experience are so outstanding as to challenge consideration. He has had eight years experience as Chief Engineer, five years as Commissioner in charge of the Department of Building, five years as Commissioner in supervision of all buildings and in charge of inspection of all buildings in the City of Detroit; he has prepared building codes for Flint, Lansing, Wyandotte, Michigan, and many smaller villages and towns and now has his code under consideration by the cities of Detroit and Minneapolis. He is a member of President Hoover's Committee on Home Ownership, a former President of the Building Officials of the United States, a former consulting engineer for the Steel Joist Institute of America; has prepared Standard Specifications for the use of steel joists which have been accepted by the Steel Joist Manufacturers Institute and by the Bureau of Standards of the United States. He says:

"As to anchor, I think it is all right. It is ample. You must remember that as soon as the masonry above is placed on there, that is imbedded in mortar and is in a vice. It is being held with sufficient strength. It is in line with the very old practice of anchoring wooden joists."

On cross examination:

"Q. What length would you buy for a twenty three foot span? If the space between the walls is twenty three feet to span that space what length bar joist would you buy?"

"A. When bearing on masonry walls good practice requires twenty three feet eight inches over all, four inches over the span at each end."

And a later answer:

"A joist 23 ft. 8 in. over all would go onto a twenty three foot span or any span from 23 ft. down to 22 ft. span. Then that point at the turned up ends would just intersect the wall. In that case there would be a ten inch bearing. There is four inches for the longer span and six inches of variation. Now, in this instance, if they had used the next longer size of joist, another foot longer, the joist would have stuck over ten inches instead of four inches. If they had gone in 10 inches it would have necessitated cutting away the face brick, and resulted in a leaky wall. That's a disadvantage, whereas this joist comes on the wall far enough. In this case, the particular joist furnished fits the building quite properly. In determining the design of the bar joists and testing them, a number of joists are taken and supported first at the shortest possible span, in this case 22 ft., and then at the longest possible span, in this case 23 ft., and the joist placed in a testing machine and loaded until it breaks down. The strength of the joist on its shortest and its longest spans is just about the same in both cases."

We come now to the vital question of the safety of the construction of the walls wherein cinder block and load bearing tile have been used instead of brick. In the first trial of this case, about twenty witnesses testified and this court has had the advantage of this testimony, together with many other witnesses. The record abounds with figures and tests tending to show particularly the relative strength of brick and cinder block laid in a wall. We shall not discuss these tests other than to say that in general the great difference in figuring the strength of the walls where the steel joists rest resulted from the number of square inches taken by the computer as representative of the space covered by the bearing plates of the joists. In other words, the plaintiff's witnesses took the width of the bearing plate, which is 4½ inches, and multiplied it by the actual surface of cinder block on which they claim the steel joist rested, which was from an inch and a half to an inch and three quarters. This would give them in all instances less than

eight square inches. The defendants' experts took the width of the bearing plate, 4½ inches, and multiplied it by four inches, the full depth of the bearing plate, which gave eighteen square inches in all instances. It seems to us that the difficulty in this case does not come alone by the use of cinder block but by a combination of use of cinder block with a large amount of void all the way up to the place where the steel joist is laid upon the wall, together with a minimum length of steel joist which only permitted a four inch bearing upon this block. Had the contractor used a few courses of brick on top of the cement block, as is done in some places, the four inch bearing would seem more secure, or had he used a longer bearing upon the cinder block, even though the voids were not filled, the added bearing surface would have assured more safety.

We entertain no personal opinions independent of this record on the comparative strength of brick and cement block in load bearing walls. It is undisputed that the State of Ohio accepts cinder block wall as capable of bearing a load such as will fall upon the walls under consideration. E. W. Brill, Chief of Division of Workshops and Inspection of the State of Ohio, whose duty it is to inspect all public buildings where the public may assemble to determine their safety from a structural and sanitary viewpoint, and who is required to pass upon all plans for public buildings outside of municipalities which have their own building inspection department, expressly testifies that the walls in this school building are safe and are being built according to the General Code of Ohio. He bases this on personal observation, as well as upon a written report of George D. Richardson, architect and inspector of his department, which is in the record.

We have examined this building twice and read every line of the testimony, some of it several times, and are of opinion that it does not appear that the walls are unsafe by reason of the use of the cinder block at any place unless it would be where the joists rest upon them, and that they are not unsafe there if the voids in the blocks at the place where the bearing of the joists rest have been filled to the level of the top of the block with cement. In all instances where the joists have been installed and the work completed the joists are covered and there is no certain way to determine whether or not the cinder blocks have been filled with cement. The testimony of several of defendant's witnesses who were identified with or saw the work in construction is to the effect that they were all properly filled. The testimony of some of plaintiff's witnesses is to the contrary. In the wall which was blown down our examination discloses, insofar as we can see, that the voids were filled, but it is impossible to tell definitely whether or not this has been done in all places unless the walls were razed and the joists removed. This step should be avoided if in any other manner the safety of the walls can be determined. It should be observed that the amended petition charges no fraud against the contractor nor collusion between him and the architect. It is admitted that the contractor acted under the express direction of the architects in erecting the walls and placing the joists and anchoring them. As the plaintiffs do not question the good faith of the contractor, we certainly should not do so. He then should not be required to take the drastic step of tearing down all of these walls if they are safe, as the determination of this case in no wise would preclude the board recovering in civil damages a sum representative of what they have lost by the failure of the contractor to observe his contract to follow the plans and specifications.

We believe that the test which was made over three of the steel joists bearing upon the walls in controversy fairly disclosed that the walls under these three joists were safe. The total load applied was 15,400 pounds and the load per square foot on the wall under the joist was 143 pounds. This is greatly in excess of any load that will in any probability ever be placed upon them.

We have therefore concluded that if this test is applied to all the joists with the 23 foot span 23½ inches apart from center to center, and a like comparative test applied to the other joists with less span on the second floor, with no evidence of weakening or breaking down of the walls under the tests, that they may be considered safe. This test should be made as the first one was conducted over three joists at a time, taking them in succession, beginning at one end of the span and extending the full length thereof. The plaintiff may have a representative present at these tests (and we would suggest Professor Joseph N. Bradford) to check them and to report the weakness which may develop in the walls, if any. The cost of Professor Bradford's services shall be taxed in this case. We do not require that as a part of this test,

as in the one conducted, men shall stand upon the blocks, because obviously it would be dangerous if any of the joists would fall.

If these tests result as did the one test in the record, the building may proceed without any razing of walls. If the walls prove to be defective, we will require that they be torn down, the extent of which will be determined after the report is made of the test. If, for any reason, the defendant contractor will not conform to the tests we have suggested, it may be decreed that all the load bearing walls be torn down to the third course of cement block or load bearing tile below the course upon which the steel joists rest and that the wall be built from there up of a good quality of common brick.

The entry in this case may be prepared at once or withheld until after a determination of (1) whether or not the tests will be made, and (2) if they are made after a determination of their results.

The court will confer with counsel for the parties as to further proceedings and fixes the day for the conference at Columbus, Wednesday, April 6th.

The conduct of plaintiff, which defendant Contractor insists constitutes laches, is urged. The case of **State ex v Green, 18 N.P. (N.S.) 97, 22 C.C. (N.S.) 1**; motion to certify overruled in Supreme Court, **130 L. R. 108**, holds that,

"Laches of a taxpayer personally is not a bar to his suit in a representative capacity."

The record abounds in testimony respecting one of the main walls running east and west through the building and it is testified that the supporting wall at the base is narrower than the wall above. From the record, and upon observation, this appears to be true and it is a departure from the original specifications. However, it is claimed that it was caused in part by an alternate bid of the contractor accepted by the Board and further that it can be corrected. The amended petition and answer do not raise any issues on the insufficiency, the incompleteness or lack of safety in the the construction of this wall, and this testimony was taken in this court under objection of counsel for the defendant, and we, therefore, do not feel called upon to enter a decree respecting it, the effect of which would be doubtful in the extreme.

On the walls yet remaining to be erected the decree may provide, if desired, that the specifications as interpreted by this court shall be followed and that the load bearing walls be erected of a good sound quality of common brick.

ALLREAD, PJ, HORNBECK and KUNKLE, JJ, concur.

## ON APPLICATION FOR REHEARING

Decided April 15, 1932

### BY THE COURT

We have considered the grounds for rehearing together with the evidence relating thereto and particularly that pertaining to the feasibility of the test proposed by the court in its former opinion.

Upon consideration we do not feel that such proof has been offered as would justify a rehearing nor are we convinced that the test proposed is impracticable.

It was testified by Professor Bradford that the test, although in his judgment not the proper one, would be fairer and more nearly determine the question at issue; namely, the strength of the walls where the steel joists rest; by first pouring the concrete floor and then applying the weight to the whole floor in the proportion that the weight was applied to the slab over the two joists. Counsel for defendants have indicated a willingness to conduct the experiment upon this basis. The court is therefore substituting this modified plan for the one suggested and after the concrete is poured a date may be fixed by the contractor upon which the test will be conducted. Notice should be given to counsel for plaintiff, at least a week before the test, of the date and hour when it will begin and it may proceed as we indicated in our former opinion and in the conference with counsel at Columbus.

Our attention is drawn to the fact that we made no comment in our opinion upon the bonding of the walls under consideration. We find from the record that there is testimony by Mr. Dole in two places in the record to the effect that the walls were bonded at least every fifth course by using cinder block on one side and hollow tile on the other and lapping the cinder block across the hollow tile and that this is the

usual method of bonding such walls.

We are not convinced that this is not the proper form of construction, nor that the bond is insufficient.

Our attention has been directed to the full text of that portion of the "Builders Pocket Book" by Kidder and Nolan to which reference was made in the testimony on rehearing. Suffice to say that our determination is made independent of the effect of this suggested test of Kidder.

All other matters were considered at length in our former opinion.

The application for rehearing will be denied.

ALLREAD, PJ, HORNBECK and KUNKLE, JJ, concur.